**MEMO ENDORSED**

**PARKER AND CARMODY, LLP**
ATTORNEYS AT LAW
850 THIRD AVENUE
14TH FLOOR
NEW YORK, N.Y. 10022

DANIEL S. PARKER
MICHAEL CARMODY
CHRISTINA S. COOPER

TELEPHONE: (212) 239-9777
FACSIMILE: (212) 239-9175
DParker @ParkerandCarmody.com

March 26, 2020

Deft's request for bail is denied without prejudice to seeking an initial bail application before the Crim. Duty Magistrate Judge. Clerk of Court requested to terminate the motion (doc. 10).
Dated: March 31, 2020
SO ORDERED.

Nelson S. Román, U.S.D.J.

**By ECF**
Hon.  Nelson S. Roman
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

Re: <u>United States v. Richard Emanuel</u>
**20 Cr 0048 (NSR) -02**

I write on behalf of Richard Emanuel ("the defendant" or "Mr. Emanuel") requesting

that the Court issue an order, granting bail to Mr. Emanuel, on the condition that he be placed on

home detention secured by electronic monitoring.

If this application is granted, Mr. Emanuel would reside with his girlfriend, Rebekah

Chambers, and their one and one-half year-old son at her residence located at 405 Vista on the

Lake, Carmel, NY. In addition, Ms. Chambers and another person would willingly co-sign a

$100,000 personal recognizance bond.

The basis for this bail application is the impact of the COVID-19 outbreak and

its spreading in the Westchester County Jail ("WCJ") in Valhalla, NY and Mr.

Emanuel's pre-existing and current medical condition which leaves him highly

susceptible to catching the virus.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/2020

1

I have conferred with AUSA Shiva Logarajah regarding this application and he has informed me that the Government opposes Mr. Emanuel's release.

Mr. Emanuel was arrested, charged by Complaint with participating in a Conspiracy to commit Hobbs Act robberies along with his co-defendant, Dylan Purdy and presented before the Hon. Lisa M. Smith on December 18, 2019. He was thereafter indicted and arraigned before the Hon. Lisa Smith on January 22, 2020. At the time of his presentment, the Government sought detention and Mr. Emanuel reserved his right to make a future bail application. No application for bail has been made heretofore. The case was scheduled for a conference today, but with the consent of all parties, it was adjourned to May 28, 2020 at 11:00 a.m. No trial date has been set.

I write now to request the court grant temporary release, with such other conditions as the Court deems just and necessary, under 18 U.S.C. § 3142(i), because such release is necessary for "compelling reasons" and "necessary for preparation of the [Mr. Emanuel]'s defense." 18 U.S.C. § 3142(i); See 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in a bail application); see also U.S. v. Dante Stephens, 15 Cr. 95 (AJN), ECF No. 2798: Opinion & Order dated March 18, 2020 (finding under § 3142(i) that the current lockdown and denial of counsel visits were sufficient compelling reasons for release of an inmate before her charged with a serious and violent felony (there "having a loaded firearm in proximity to guns")).

Here, the compelling reasons are threefold: (1) Mr. Emanuel has a significant pre-existing medical condition that is not being appropriately treated at WCJ and leaves him at great risk to the coronavirus pandemic.  Specifically, in 2014, Mr. Emanuel was shot multiple times. He suffered a collapsed lung as well as injuries to his throat, neck, carotid artery, and larynx. He was hospitalized for months in critical condition and he had an artery rebuilt using an artery from his inner thigh.  As a result of this near-death incident, he now suffers from respiratory problems, frequently manifested by a shortness of breath;[1] (2) Mr. Emanuel, like all other inmates at WCJ, is at a substantially heightened risk for not only contracting the COVID-19 virus, but spreading it; and (3) the WCJ's total lockdown is denying Mr. Emanuel access to counsel.

I propose that Mr. Emanuel be released temporarily subject to conditions of home incarceration and electronic monitoring that would prevent the risk of flight or danger to the community during the COVID-19 crisis. If this Court grants a temporary bail, it could review the bail decision again when the danger of the virus has concluded.

In a press conference today, United States Attorney General William Barr said, "You want to make sure that our institutions don't become petri dishes and it [COVID-19] spreads rapidly through a particular institution… But we have the protocols that are designed to stop it and we are using all the tools we have to protect the inmates."

---

[1] Copies of Mr. Emanuel's 2014 medical records have been provided to the Government and will be made available to the Court if requested.

He added, "… one of those tools will be identifying vulnerable prisoners who would make more sense to allow to go home or finish their confinement."

1.   **Mr. Emanuel should be granted temporary release because his presence at WCJ places him at substantial risk and heightens the risk of infection to other inmates at the WCJ, WCJ staff, and the New York City community**

New York City is facing a serious and urgent public health crisis.[2]  On March 11, 2020, the World Health Organization officially classified COVID-19, the respiratory illness caused by a novel strain of coronavirus, as a global pandemic.[3] On January 21, 2020, Washington State announced the first confirmed case in the United States.[4] Only two months later, COVID-19 has infected over 41,701 people across the United States, leading to at least 537 deaths.[5] On March 19, 2020, the White House announced that the COVID-19 crisis could last until July and that gatherings over 10 people should be avoided.[6]

---

[2] I gratefully acknowledge most of the research for this letter brief and the arguments in support of this application which applies generally to federal inmates, was conducted by my gifted colleagues at the office of the Federal Defenders of New York and drafted by my colleague Samuel Braverman, whose thoughtful and thorough motion serves as a template for this application. The numbers of victims in the outbreak have risen so dramatically and exponentially and with such great rapidity that it is impossible to keep current.

[3] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[4] First Patient With Wuhan Coronavirus Is Identified in the U.S., The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[5] See Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 25, 2020), at https://nyti.ms/2t6WE75 (updating regularly).

[6] Rachel Sandler, Trump Says Crisis Could Last Until July, Recommends No Gathering Over 10 People (March 16, 2020) at https://www.forbes.com/sites/rachelsandler/2020/03/16/cdc-all-americans-should-avoid-gathering-in-groups-of-more-than-10-people/#5f9fd51a283d.

Infections are increasing at an exponential rate. The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. Ten days later, the state has amassed 30,811 confirmed cases of the virus, with 285 deaths.[7] In a five-day period between March 15 and March 20, New York State experienced a ten-fold increase in new confirmed cases of COVID-19.[8] As of March 25, 2020 in New York City, there were 17,857 positive cases and 199 deaths resulting from the virus (an increase of more than 3,000 cases and 60 deaths in just 33 hours.[9] Most cases are in men in their 30s and 40s. Id. New York City is the epicenter of the US pandemic.[10]

In response to this public health crisis, New York Gov. Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[11] New York City Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of more than 500 people.[12] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring individuals to

---

[7] Id.

[8] Watch How the Coronavirus Spread Across the United States, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.

[9] Coronavirus, New York City Health (Mar. 25, 2020 at 5:09pm), at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf (updating regularly).

[10] Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

[11] At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, New York State (Mar. 11, 2020) at https://on.ny.gov/2TKzIoz.

[12] DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned, The New York Times (Mar. 12, 2020).

maintain six feet of distance between each other.[13] The same day, the Federal

Emergency Management Agency (FEMA) declared New York "a major disaster."[14]

According to the Centers for Disease Control and Prevention (CDC), nearly 40% of

patients hospitalized from coronavirus were 20 to 54 years old.[15] In New York, 18- to 49-year-

olds comprise more than half of all cases in the state. In New York City, 57% of patients are

male.[16] With thousands of confirmed cases in New York City and that number increasing more

than 1,000 cases per day, that indicate community spread, it is imperative that the Court and

others must take every necessary action to protect vulnerable populations and the community at

large.

Prior to the dramatic expansion of cases in the United States, the warning signs

of a pandemic were obvious and publicly debated, yet ultimately, they were

unheeded.[17] So, again are these specific warnings about an explosion of the virus in

the prison populations. As this is being written, the virus has exploded in the

---

[13] Novel Coronavirus (COVID-19), New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).
[14] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.
[15] Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S., The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.
[16] See NYC Dept' of Health Daily Data, March 23, 2020, available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.
[17] David Sanger, Eric Lipton, Eileen Sullivan and Michael Crowley Before Virus Outbreak, a Cascade of Warnings Went Unheeded, New York Times (March 19, 2020) https://www.nytimes.com/2020/03/19/us/politics/trump-coronavirus-outbreak.html?action=click&module=RelatedLinks&pgtype=Article

Metropolitan Detention Center ("MDC"), the Metropolitan Correction Center ("MCC"), and the WCJ.

Mr. Emanuel has told his girlfriend that in the past few days, four inmates at the WCJ on his unit, Unit 2SW, have repeatedly been visited by medical personnel, had their temperatures taken, have been found to have fever and were eventually removed from the unit. Thereafter, the unit was "sprayed down." Currently, all of the inmates on his unit are confined more than normal, limited in their ability to take showers, and to make telephone calls. Two other attorneys have relayed conversations to counsel in which they learned that inmates in Block A in the WCJ have been infected, along with staff, and the entire block is "locked down."

### A. Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus.

"Prisons are petri dishes for contagious respiratory illnesses."[18] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing. In a state county jail, such as WCJ, the population is even more transient, the funds to care for inmates even more limited, and general health conditions even worse than at BOP facilities. On March 21, 2020, an inmate at the MDC tested positive for the coronavirus.[19] The individual "complained of chest pains on Thursday, a few days

---

[18] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. See also Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

[19] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at

after he arrived at the facility."[20] When he first arrived at the facility, according to authorities, he was asymptomatic. The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island publicly cautioned, "[a] storm is coming."[21]

As noted above, I was informed by Mr. Emanuel and his family as well as by other attorneys that the conditions at the WCJ and Mr. Emanuel's unit are severe and rapidly becoming more severe.  Mr. Braverman, an attorney who represents multiple inmates currently incarcerated at the WCJ, reports that one of his clients informed him that conditions on his unit are dire. That inmate reportedly said that there were 44 inmates on his tier, each one is isolated in his own cell with a toilet and a sink for 24 hours a day, seven days a week, but three of them have been removed under suspicion of COVID-19 infection. There are no showers in the cells, so the inmates do not bathe. They have no soap for washing their hands after using their toilet, let alone the shower that will not come. They are not allowed access to the commissary to buy soap if they had the funds to do so. They do not have any visits with the outside world, either family members, friends, or attorneys. The do not have access to phone calls, emails, or regular mail. Normally, each inmate is given four envelopes to send mail out to family, friends, or attorneys, but that has stopped completely. The food is served in the inmate's cell by two trustees (inmates who have been promoted out of their cell),

https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.
[20] Id.
[21] 'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

however one of the inmates on March 23, 2020 was segregated for potentially having the coronavirus. The inmates are not screened for a fever and are only segregated from the tier if they have significant medical symptoms consistent with COVID-19, at which point they have likely been contagious for a week or more. The tier has been cleaned with bleach only one time in the last four days. There is no access to the law library or discovery review. There is no medical attention to sick calls, daily medication that his client was prescribed has not be delivered, and a doctor has made just one pass on the tier since the lockdown began nearly two weeks ago. His client, as Mr. Emanuel, has heard that two corrections officers have tested positive to COVID-19, and both inmates report by their observations, that the WCJ is running between 25-50% below normal staffing.

There is no public information on the WCJ website, nor other public media that provides definitive information about the state of health, testing, and outbreak at the WCJ, and of course that lack of transparency is part of the problem.

Other anecdotal evidence consistently reports the gravity of the situation and the lack of "public" information that is consistent with what families of inmates are hearing from "those on the inside."

New York City has 25 % of the US's total COVID-19 cases (an average of ~3,800 cases per county, ), and Westchester County itself has nearly 3,900 cases.[22]

---

[22] New York State Department of Health: County by County Breakdown of Positive Cases, March 24, 2020 at 2:49pm. https://coronavirus.health.ny.gov/county-county-breakdown-positive-cases

The illusion that the WCJ staff will be able to keep the virus out of the jail, or to sequester it once it gets inside, is totally unrealistic.

Given what we know about COVID-19, the BOP's and WCJ's quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[23] Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[24]

Internationally, prisons have spawned rapid spread of COVID-19. In China, officials confirmed 500 cases in prisons.[25] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[26] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating

---

[23] The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[24] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[25] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[26] Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

conditions defies basic human decency."[27] Why should inmates in American jails be given any less decency? Shouldn't we hold ourselves to the highest standards?

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[28] One day later, on March 21, 2020, it became clear that no fewer than 38 people tested positive.[29] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[30] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[31] The New York City Bar Association has called on "all actors in the criminal justice system" to "swiftly move to reduce the density at all New York City area jails and prisons to prevent or slow the spread of the virus."[32] Notwithstanding this awareness of the problem, the BOP is doing too little and too late.

---

[27] Jennifer Hansler and Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020), at https://cnn.it/2W4OpV7.

[28] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[29] Id.

[30] Id.

[31] Id.

[32] See Statement of the New York City Bar Association Urging Immediate Steps to Reduce Prison and Jail Populations to Prevent Spread of the Covid-19 Virus at 2-3, available at https://s3.amazonaws.com/documents.nycbar.org/files/COVID_Prisons_Jails_Statement_FINAL.pdf

### A.   The WCJ remains unprepared for a coronavirus outbreak.

The Federal Defenders of New York has stated that the BOP legal department had reported to it this week that BOP had confirmed its first case of COVID-19 infection. Subsequent report indicate that there are now 10 inmates infected. No further details are immediately available. In the context of the coronavirus, where there is one case, there are 100. Given that testing at the jail is nearly non-existent, and testing itself only tells the test-giver what the status *was for the one person being tested and at the time of the test* (results typically take 5-7 days), the data is completely insufficient to give anyone any confidence in its conclusion. However, outside journalistic sources are reporting that the problems in the New York metro area jails are just beginning to become obvious. New York City Department of Corrections facility at Riker's Island reports spreading infections among inmates and staff.[33] The BOP imposed a 14-day quarantine for all new inmates at its facilities, but of course that does nothing for those who are already behind the walls.[34]

Inmates at the WCJ -- a substantial pre-trial detention facility housing hundreds of people -- are at grave risk of contracting the virus.[35] The medical care at the WCJ has repeatedly failed to adequately address even routine medical conditions.[36]

---

[33] Ben Chappman, Coronavirus Spreads Among Rikers Inmates, Staff, Wall Street Journal (March 25, 2020). Attached exhibits and at https://www.wsj.com/articles/coronavirus-spreads-among-rikers-inmates-staff-11585093154

[34] Sallie Gurman, Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus, Wall Street Journal (March 24, 2020). Attached exhibits and at https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075

[35] See U.S. v. Shakeil Knight, 19 Cr. 867 (PAC) ECF No. 16 at 12-22 (S.D.N.Y. March 23, 2020): Affidavit of Jonathan Giftos, M.D. (hereinafter "Giftos Affidavit").

[36] See e.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP)

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stop the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[37]

To prevent new infections, the CDC strongly recommends: (1) thorough and frequent handwashing; (2) cleaning surfaces with Environmental Protection Agency approved disinfectants; (3) keeping at least six feet of space between people; and (4) social distancing.[38]

To date, the WCJ has not met the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where many individuals are double-bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at least sixteen other people, or in a dormitory with 30 other people sharing just a few toilets and a few commons showers. In the days since March 13, the WCJ has abandoned its obligation to the inmates for proper hygiene and any attempts to keep the facility safe and clean.

---

Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at https://bit.ly/39JRhdW.

[37] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prison*s*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

[38] See Giftos Affidavit.

In addition to unhygienic living conditions, frequent movement between units at the WCJ over the past several weeks will spread the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "[i]t is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."[39] The WCJ will encounter the same obstacle to cabining the spread. For most of the last few weeks, WCJ has been on lockdown. During that period, inmates report that they were frequently shuttled among various housing units as officers searched for contraband. This movement once the spread of the virus was underway likely facilitated further spread at the WCJ.

The WCJ's solution curtailing all visits for 30 days creates yet another public health hurdle. Before the current complete isolation from the outside world, the inmates only contact with their families were the common telephones. Mr. Emanuel's ability to make phone calls has become limited and the phones are not adequately cleaned, creating more opportunity to spread infection.

With each additional new arrest comes increased risk of spreading the virus in WCJ. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are mixed in with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of

---

[39] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

infection: The individual who tested positive for coronavirus at the MDC on March 21,2020 was first incarcerated only a few short days before becoming symptomatic.[40] By the time he was segregated, he has been in contact with more than 100 other people.

     Notwithstanding a confirmed case of coronavirus at MDC, the WCJ remains unprepared for an outbreak. According to the Federal Defenders, the facility does not currently have the ability to test for coronavirus and there are no general screening protocols in place. Only if an inmate self-reports symptoms will he be screened for the virus. If symptomatic, the inmate will be "isolated" in his cell, exposing cellmates to risk, or moved to another area of segregation. But his movement will be by the very guards who will continue to be in contact with the hundreds of other prisoners still in the facility. Guards who interact with multiple inmates are reportedly wearing one set of gloves which they do not change.

     Given what is known about coronavirus, conditions of confinement generally, and the lack of preparedness at the WCJ, the fact that there are no publicly confirmed cases of COVID-19 to date at the WCJ reflects the fact that the WCJ lacks the ability to test for the virus. It does not mean that no one in the facility is infected. It is also obvious to all that lack of any public declaration about a positive test does not mean that there has been a lack of positive tests. U.S. Sen. Rand Paul (a *former medical doctor*) hid his positive test for coronavirus for 6 days, during which he interacted with

---

[40] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

hundreds of civilians, public officials, members of his staff and security detail, and

mislead the general public about his condition and the spread of the pandemic.[41] At the

point when the citizens cannot trust their public servants and medical professionals to

have the public's best interests at heart, the Court become the last hope for justice and

transparency.[42]

### B. The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.

The judiciary has recently begun to recognize and address this crisis. On March 12,

2020, Magistrate Judge Orenstein denied a remand application, holding that increasing

the population of the Metropolitan Detention Center could present a "danger to the

community" -- the staff and inmates inside the jail -- by potentially bringing the virus

into the facility. See United States v. Raihan, 20-CR-68 (BMC) (Mar. 12, 2020). A

week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante

Stephens, the Hon. Alison J. Nathan reversed a prior bail decision "in light of

circumstances that have changed since the March 6 hearing," namely, "the

unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic."

U.S. v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan

noted that "[a] comprehensive view of the danger the Defendant poses to the

community requires considering all factors," including COVID-19. Id. Similarly, on

---

[41] https://www.nytimes.com/2020/03/22/us/politics/coronavirus-rand-paul.html?searchResultPosition=1

[42] Ellen Gabler, States Say Some Doctors Stockpile Coronavirus Drugs, For Themselves, New York Times, (March 24, 2020) https://www.nytimes.com/2020/03/24/business/doctors-buying-coronavirus-drugs.html

March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly

detained individual on bail. See U.S. v. Santiago Ramos, 20-CR-04 (ER).

This week, Judge Paul Englemeyer rejected the application of a sentenced prisoner

to be released to a halfway house because Judge Englemeyer believed he lacked the

legal authority to release a sentenced prisoner.[43] But indicating that he understands the

significant public and private health considerations, he wrote the following:

> At the time of sentencing, however, the Court did not know and
> could not have known that the final four months of Mr.
> Hernandez's sentence would be served at a time of a worldwide
> pandemic to which persons with asthma, like Mr. Hernandez,
> have heightened vulnerability. Section 3553(a) instructs a
> sentencing court to consider, inter alia, the "history and
> characteristics of the defendant" and "the need to provide the
> defendant with needed... medical care." 18 U.S.C. § 3553(a).
> Had the Court known that sentencing Mr. Hernandez to serve
> the final four months of his term in a federal prison would have
> exposed him to a heightened health risk, the Court would have
> directed that these four months be served instead in home
> confinement.

### Mr. Emanuel should be released until the crisis subsides in order to protect his Sixth Amendment right to counsel

The conditions of confinement at the WCJ have gutted Mr. Emanuel's Sixth

Amendment right to the effective assistance of counsel. Until he is released, he will

continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial

system of criminal justice. As the Second Circuit emphasized in a decision handed

down last week: "The right to consult with legal counsel about being released on bond,

---

[43] *United States v. Jones (Daniel Hernandez)*, 1:18-cr-00834-PAE (Docket entry 440, dated
March 25, 2020)

entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at

trial, locating trial witnesses, and other decisions confronting the detained suspect,

whose innocence is presumed, is a right inextricably linked to the legitimacy of our

criminal justice system." Federal Defenders of New York, Inc. v. Bureau of Prisons,

Docket No. 19-1778 (2d. Cir. March 20, 2020). In recognition of this vital right, BOP

regulations instruct that detention center wardens "shall provide the opportunity for

pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a).

A detention facility therefore violates the Sixth Amendment when it

"unreasonabl[y] interfere[s] with the accused person's ability to consult counsel."

Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference

requires a showing far less alarming than the one present here. In Benjamin, the

Second Circuit held that New York City correctional facilities violated the right to

counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in

meeting with clients" and were "forced to wait between 45 minutes and two hours, or

even substantially longer, after arriving at a facility to see a client." Benjamin, 264

F.3d at 179.

Further, in the likely event that someone at the WCJ tests positive for

coronavirus,[44] the entire facility will go on a total lockdown, further inhibiting Mr.

Emanuel's constitutional rights. At MDC, immediately after an inmate tested positive

for the coronavirus on March 21, 2020, the facility went on lockdown indefinitely: no

---

[44] In the time that it has taken counsel to adapt this previously-written memorandum, another inmate in Mr. Emanuel's unit has been removed, making it at least 4 out of 40 who have taken away for medical reasons.

inmates are allowed into or out of the building for any reason, *including for previously scheduled court appearances*. The Court should expect this will be the case once a COVID-19 case is confirmed at the WCJ. That event will mark the evisceration of Mr. Emanuel's right to counsel.

In Wolfish v. Levi, the Second Circuit held that the WCJ "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir. 1978), rev'd on other grounds, 441 U.S. 520 (1979).

As the public health crisis rapidly evolves, so too does the judiciary's perspective on release. On March 18, 2020, Chief Judge McMahon granted an application for bail based on compelling reasons related to the current health crisis. Defense counsel had argued that "[a] complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial…." U.S. v. Hudson, 19-CR-496 (CM) (Mar. 13, 2020). Five days earlier, she had denied the request. Id.

Mr. Emanuel remains innocent until proven guilty. To mount an effective defense at trial, he must be released from custody. This extraordinary moment requires judicial intervention to safeguard his constitutional rights – and by extension, the constitutional rights of everyone.

19

A. **The Bail Reform Act contemplates Mr. Emanuel's temporary release until the crisis ends and to ensure Mr. Emanuel's right to counsel**

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States Marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). There is no greater necessity for the preparation of a "person's defense" than access to counsel. There is no more "compelling reason" than the individual's physical health and the health and safety of the community.

In her decision last week, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." U.S. v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). See also U.S. v. Perez, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

In U.S. v. Rodriguez, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively

'reasonable.'" Id.; cf. Falcon v. U.S. Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

With the Bureau of Prisons and WCJ on lockdown for the foreseeable future and no evidence that the wave of infections has crested, the only way to ensure Mr. Emanuel's statutory and constitutional right to consult with client is to temporarily release him at this time. In the throes of this public health crisis, the Court should release Mr. Emanuel to protect his physical health.

In a variety of similar applications in this District, the Government has made a variety of objections to applications for temporary release. Anticipating the arguments of the Government and offering counterpoints as to why they are not persuasive, we suggest the following:

1.      If the Government were to argue that "the Defendant does not allege that he has been personally exposed to coronavirus at WCJ," it is correct that Mr. Emanuel does not yet have definitive proof that this has happened.  Of course, once a person has been exposed to the virus, the opportunity for prevention will have been missed. Since the correctional facilities are not testing inmates until they show multiple symptoms of the illness, when they are at their most contagious, by the time it is definitively determined that he has been exposed, it will be too late to prevent the risk that exposure has resulted in contagion. There are several pharmacological protocols that are being tested now and which seem to be promising, and rely on early

intervention with the patient.[45] Once an inmate has developed the full-blown virus and its symptoms and conditions, the opportunity will have been missed. Moreover, the people who are directly tasked with caring for the yet-to-best-tested inmates, the corrections officers, the medical staff, and the civilian staff are themselves getting sick.[46]

     2.     If the Government were to argue that the BOP and the WCJ have been planning for the global pandemic and its impact on the prisons for two months, their planning has been an abject failure. Chief Judge Colleen McMahon, Federal Defender Attorney in Chief David Patton, and Federal Defender Attorneys-in-charge Jennifer Brown and Deirdre Vondornum met with the Warden of MCC on March 12, 2020, the day before the facility shutdown to all visitors.  As of March 12, the MCC Warden said they were still waiting for guidance from national BOP, their immediate plan was that they could issue hand sanitizer to all the units once it was ordered and received, and that anyone who tested positive would be held at the hospital not at the

---

[45] Kai Kupferschmidt, Jon Cohen <u>WHO Launches global Megatrial of the Four Most Promising Coronavirus Treatments</u>, ScienceMag.com (March 22, 2020) https://www.sciencemag.org/news/2020/03/who-launches-global-megatrial-four-most-promising-coronavirus-treatments. *But see* Michelle Fay Cortez <u>Malaria Drug Hydroxychloroquine No Better Than Regular COVID-19 Care</u>, Bloomberg.com (March 24, 2020) https://www.bloomberg.com/news/articles/2020-03-25/hydroxychloroquine-no-better-than-regular-covid-19-care-in-study

[46] Cassidy McDonald, <u>Federal Prison Say Conflicting Orders On Coronavirus Putting Their Lives At Risk</u>, CBSNews.com (March 19, 2020) https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/I am further informed that numerous Marshals in SDNY and EDNY are also positive or symptomatic (10 Marshals in SDNY in quarantine; 4 Marshals in EDNY have tested positive, a CSO has tested positive, and many others are symptomatic and unable to come to work). What the status of the workforce for the non-transparent BOP is unknown.

jail. Ordering a couple jugs of Purell is not proof that BOP was prepared for this crisis.

3.      If the Government were to argue that "the Defendant does not give details about why his place on the outside will be better than WCJ," it is hard to fathom how his self-isolation in a home with his symptom-free girlfriend and their toddler, will not be medically safer than in prison. If released, he will reside in Carmel, NY, under house arrest, with electronic monitoring to ensure that he does not leave. Further, he will not be going out because of the current order of sheltering-in-place by Gov. Cuomo. (*supra, at FN 11*) Additionally, if Mr. Emanuel should unfortunately become sick, he has a better chance at obtaining immediate and quality medical care with local hospitals than he would at the BOP or WCJ.[47] The BOP will isolate a sick patient until such time as his condition deteriorates so much that he then has to be hospitalized.[48]

## Conclusion

Legitimate questions abound relating to the coronavirus and the best path to choose in fighting it. It is far from clear what to do in response to the global pandemic, on an institutional level, such as at the WCJ or the MDC, on a systemic level, like the

---

[47]   Jennifer Gonnerman, <u>A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus</u>, The New Yorker (March 20, 2020) <u>https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus</u>

[48] M. Licon-Vitale, Warden <u>"Memorandum For All MCC New York Staff"</u> <u>https://mobile.twitter.com/keegan_hamilton/status/1242226507759509504</u>

BOP nationwide, or across a segment of society, like the criminal justice system or the City of New York, or for the world entire. What is requested in this case, however, is that the Court rule on the merits of one individual's application.

I respectfully ask the Court to protect Mr. Emanuel's vulnerable and compromised health as well as those around him, and to protect his constitutional right to counsel, due to the threat that continued incarceration poses to Mr. Emanuel's immediate safety. As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time, comprehensive solutions, reached in cooperative institutional discussions." Federal Defenders of New York, Inc. v. Bureau of Prisons, No. 19-1778 (2d. Cir. March 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

Accordingly, I respectfully request that the Court issue an order releasing Richard Emanuel, placing him on home incarceration with an electronic monitoring device and imposing whatever additional conditions the Court sees fit for the duration of the COVID-19 crisis.

Thank you for your immediate attention to, and consideration in, this matter.

Respectfully submitted,


/s/  Daniel S. Parker
Parker and Carmody, LLP
850 Third Avenue
14th Floor
New York, NY 10022
Tel. 212-566-6213


Cc:    AUSA Shiva Logarajah (BY ECF and email)

       David Patton, Attorney-in-Chief Federal Defenders (by email)